IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LORD ABBETT MUNICIPAL INCOME FUND, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 1:12-CV-1099-WKW [WO] |
| SOUTHERN FARMS, INC., *et al.*, | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

In an order entered on December 12, 2013 (Doc. # 38), the court denied Defendants' motions to dismiss the amended complaint. This Memorandum Opinion sets forth the court's reasoning for its ruling.

Defendants Southern Farms, Inc., and John Keith Givens moved to dismiss the amended complaint (Doc. # 34, 35), and Plaintiff Lord Abbett Municipal Fund, Inc., responded (Doc. # 36), incorporating many of its arguments in response to Defendants' previous motions to dismiss (Doc. # 26). Defendants did not file reply briefs.

## I. JURISDICTION AND VENUE

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). The parties do not contest personal jurisdiction or venue.

## II.  STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction.  *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007).   On a Rule 12(b)(1) facial attack, the court evaluates whether the complaint "sufficiently allege[s] a basis of subject matter jurisdiction," employing standards similar to those governing Rule 12(b)(6) review.  *Id.*

When evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012).  To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).

## III. BACKGROUND

### A. <u>Facts</u>

The facts that set the stage for Lord Abbett's claims are many and complex. Extensive detail is necessary for understanding the overall context of Lord Abbett's claims and the parties' alleged rights and obligations with respect to certain property.

### 1. *The Beginnings of Country Crossing*

In October 2008, Ronnie Gilley of Ronnie Gilley Properties, LLC undertook to create Country Crossing, a large, mixed-use development in Houston County, Alabama. Ronnie Gilley Properties set up Country Crossing to be owned by three separate limited liability companies – Resorts & Entertainment Group II, LLC, Resorts Development Group II, LLC, and Country Crossing, LLC. Each of those three companies issued 200,000 membership units representing equity in the companies. Ronnie Gilley Properties entered into several agreements to purchase 375 acres of undeveloped land on U.S. Highway 231 from Defendant Southern Farms[1] that would become the site of Country Crossing. The parcel cost $19,840,000, which Lord Abbett asserts was an excessive price in comparison to its *ad valorem* tax value of $1,290,000, as well as in comparison to another piece

---

[1] Lord Abbett alleges that Mr. Givens is the President and sole shareholder of Southern Farms, and that the corporation is an "adjunct, instrumentality, and alter ego" of Mr. Givens. (Doc. # 33, at ¶¶ 4, 72.)

of property on the same highway that was larger and significantly less expensive. Southern Farms also received as consideration for the sale a 5% equity interest in each of Country Crossing's three limited liability company owners.

Southern Farms financed the land sale at 0% interest and retained a first priority mortgage on the property, but per the land sale contract, Southern Farms agreed to enter subordination agreements in favor of lenders that financed improvements to the property.   The loan was to be repaid in full between June 2009 and September 2013.   As additional security for Country Crossing's repayment of the purchase price, Southern Farms received (1) personal guarantees from Ronnie Gilley Properties and associated business entities, and (2) pledges in membership units / equity in Country Crossing's three limited liability company owners, representing a twenty-five percent equity interest in Country Crossing. Hence, through pledges and outright ownership, Southern Farms controlled 30% of the business entities that owned Country Crossing.

### 2.    *Creation of Bond Obligations and the Validation Order*

To facilitate Country Crossing's development, the Houston County Commission created two Districts, the "Cooperative District of Houston County – Country Crossing Project" and the "Improvement District of Houston County – Country Crossing Project," collectively "the Districts," which operated within Country Crossing's 375 acres.   The Districts, which are governed by Boards, are

4

authorized by Alabama law to issue bonds to finance the costs of public improvements on the Country Crossing property.  The bonds are made payable by fees, similar to sales taxes, and special assessments, similar to *ad valorem* taxes, imposed on activities and real estate, respectively, at Country Crossing.  The Cooperative District was authorized to issue bonds in favor of the Indenture Trustee not to exceed $73,170,000 to fund public improvements for Country Crossing.

Pursuant to a 2009 Trust Indenture, the Cooperative District issued limited obligation bonds, known as the Series 2009 Bonds, in the amount of $21,325,000 to underwriter Gardnyr Michael Capital, Inc., who in turn sold the Series 2009 Bonds to various series of funds of Lord Abbett.  The Series 2009 Bonds were to be paid from collections of special assessments and special licenses fees, bingo machine fees, lodging fees, and events fees.

By a separate transaction in 2010 known as the First Supplemental Indenture, the Cooperative District sold more bonds to Lord Abbett in the amount of $7,735,000, which since have been refunded and reissued twice, most recently in 2012, and which remain outstanding.  The amended complaint refers to these bonds as the Series 2012 Bonds. As security for the First Supplemental Indenture, the Cooperative District granted the Indenture Trustee a governmental mortgage interest against the District Utility Property, which the complaint defines as "a

wastewater treatment plant and other public improvements located on a 52.45 acre parcel" of Country Crossing. (Doc. # 33, at ¶ 21.) Collectively, the Series 2009 Bonds and the Series 2012 Bonds hereinafter will be called "the Bonds."

The Cooperative District successfully petitioned the Circuit Court of Houston County, Alabama, to validate the issuance of the Bonds, special fees, special assessments, and their means of repayment. Per Alabama law, validated bonds and the revenues that provide for their payment cannot be called into question in any Alabama court.

### 3.   *The Undoing of Country Crossing*

Alabama law enforcement officials determined that electronic bingo played at Country Crossing was illegal slot machine gambling, and they endeavored to prevent Country Crossing from offering electronic bingo to the public. They succeeded, effectively eliminating electronic bingo operations at the site. Country Crossing closed and has not reopened. Ronnie Gilley was indicted in federal court and pleaded guilty to bribing members of the Alabama Legislature. He is serving a prison term. His companies went bankrupt. And because there has been no economic activity to tax at Country Crossing, and no receipt of assessments, the Districts have been unable to make payments due on the Bonds.

### 4. *Defendants' Allegedly Tortious Activities*

Lord Abbett avers that Mr. Givens, who is an attorney, "had access to information, influence over [Ronnie] Gilley and his companies, and control of the management at Country Crossing" unlike any other besides Ronnie Gilley himself. (Doc. # 33, at 12.)  Mr. Givens allegedly used his advantage to benefit himself at the expense of Country Crossing's creditors which had superior rights.

### a.    Release of Mortgage as to Bingo Facility Site

In January 2009, Ronnie Gilley's companies entered two agreements that contemplated reduction of the principal owed to Southern Farms on the land sale note.  Under the agreements, another businessman, Milton McGregor, would loan money to Gilley, and Gilley would also obtain a construction loan from another source.  Both sources of revenue to Gilley were to enable Gilley to make two payments reducing the principal balance of the $19,840,000 owed to Southern Farms.  In exchange, the agreements obligated Southern Farms to release a portion of its mortgage on the property.  Thus, in consideration for Gilley's payment of $300,000, Southern Farms agreed to release its mortgage as to the 8.57 acres upon which the Country Crossing bingo facility would be constructed.[2]  McGregor's

---

[2] It is not clear what advantage Gilley received from obtaining a release of the Southern Farms mortgage as it pertained to the site of the bingo facility, because Southern Farms already contractually promised to subordinate its mortgage interest in favor of lenders who financed improvements to Country Crossing, such as the construction of the bingo facility.  (*See* Doc. # 33, at ¶ 14.)

$5,000,000 loan to Gilley also enabled Gilley to pay an additional $200,000 to reduce the principal of the debt owed to Southern Farms.[3]

On August 19, 2009, Southern Farms and Resorts Development Group II, LLC entered an amended mortgage and promissory note that changed the initial payment due date from June 2009 to August 2009 and made the initial payment $1,180,486.   The agreement further subjected $3,000,000 of the original sales contract price to an 18% interest rate.   The agreement stated that the principal reduction payments, presumably for $500,000, were only an inducement for Southern Farms to amend the mortgage agreement, and that the previous payment of that sum did not affect payments to be made under the amended mortgage agreement.   In other words, Ronnie Gilley paid Southern Farms $500,000 to refinance the $19,840,000 loan on terms less advantageous to Country Crossing and more advantageous to Southern Farms than the previous terms.   The agreement further conditioned Southern Farms's release of the mortgage as to the bingo facility acreage upon Southern Farms's receipt of the first mortgage payment of $1,180,486.   When Southern Farms receipted that payment in August 2009, Mr.

---

[3] Lord Abbett obtained copies of the two agreements from the bankruptcy proceedings involving Resorts Development Group II; the agreements are attached to the amended complaint. (*See* Docs. # 33-3 and 33-4.)   Lord Abbett also attached evidence that the $300,000 and $200,000 payments were actually made to Southern Farms.  (*See* Doc. # 33, at 9.)   Lord Abbett suggests that it is possible that another loan from McGregor to Gilley made possible another, separate $300,000 payment to Southern Farms.  (*See* Doc. # 33, at ¶¶ 41–42.)

Givens executed the partial release of the mortgage as to that parcel of the property.

### b.    Release of Mortgage as to District Utility Property

Lord Abbett further alleges that in November 2009, Resort Development Group II made a $2,235,238.07 payment to Alliance Construction, LLC, an entity purportedly under Ronnie Gilley's control.  Lord Abbett believes that this money was intended for payment to a contractor that made improvements to the District Utility Property, but instead, Ronnie Gilley diverted the sum to Southern Farms in order for Resort Development Group II to obtain a separate partial release of Southern Farms's mortgage as to the 52-plus acres comprising the District Utility Property.  Mr. Givens executed Southern Farms's mortgage release as to that parcel in November 2009.  (*See* Doc. # 33, Exhs. 7 & 9.)  Lord Abbett believes that Mr. Givens refused to subordinate Southern Farms's interest in the District Utility Property, as it was obligated to do pursuant to the original note and mortgage, and that Mr. Givens demanded more money from Gilley before executing the release.  Lord Abbett claims that Mr. Givens sought to obtain this money off-the-books from an already insolvent Resort Development Group II and that this action amounts to fraudulent intent to hinder other creditors.

In December 2009, Resort Development Group II paid Southern Farms another $855,714.29 for reasons unknown to Lord Abbett.  Lord Abbett thus avers

that Southern Farms was paid not less than $4,700,000, all while Resort Development Groups II was insolvent and while Givens owned substantial shares in Country Crossing's owner-companies.  Lord Abbett alleges that a substantial portion of the money passed directly through Southern Farms to Mr. Givens.

### c.      Southern Farms's Efforts to Foreclose on the Property

Lord Abbett alleges that Mr. Givens proceeded to foreclose upon the *entire* Country Crossing property notwithstanding his two prior releases of Southern Farms's mortgage against the bingo facility acreage and the District Utility Property parcel.  To accomplish this foreclosure, on September 12, 2011, Southern Farms unilaterally executed and recorded a partial rescission of its release declaring null and void its August 2009 release of its mortgage as to the bingo facility property.  Southern Farms gave no consideration in exchange for rescission of the mortgage release.  In November 2011, Southern Farms sued Ronnie Gilley and all of the Country Crossing corporate owners for default on the mortgage and demanded judgment in the amount of $20,608,171.54.[4] [5]

Lord Abbett claims that the special assessments assessed by the Districts and owed to the Indenture Trustee constitute liens against the property superior to Southern Farms's mortgage security interest against the property.  Lord Abbett

---

[4] Lord Abbett also alleges that Southern Farms simultaneously sued Ronnie Gilley Properties for default on unsecured loans with exorbitant annual interest rates.

[5] Lord Abbett does not know how Southern Farms calculated the judgment amount that it demanded.

alleges that Mr. Givens sought to strip the Indenture Trustee of its superior lien interests arising from the unpaid assessments by persuading the Districts' Board Members to pass a resolution (the "Resolution") invalidating and suspending the collection of special assessments. Upon information and belief, Lord Abbett claims that Mr. Givens drafted the Resolution.

Lord Abbett avers that Mr. Givens's involvement in the Resolution's passage was wrongful in several respects. First, the meeting at which the Districts passed the Resolution violated the Alabama Open Meetings Act, preventing Lord Abbett from opposing the Resolution. Second, Mr. Givens falsely represented to the Districts' board members that the imposition of special assessments was unlawful, even though the Circuit Court of Houston County had validated the issuance of bonds to be funded by collection of the assessments. And third, Lord Abbett alleges that Mr. Givens withheld from the Board members the facts that he had already received $4,700,000 in repayment of its loan and that he had signed releases of Southern Farms's claims to the majority of the Country Crossing property subject to the special assessments.[6]

---

[6] After the Districts passed the Resolution, Lord Abbett prompted the Indenture Trustee to sue the District Boards in this court. *See U.S. Bank Nat'l Ass'n v. The Improvement District of Houston County – Country Crossing Project*, No. 1:12-cv-930-WKW (filed Oct. 23, 2012). That litigation resulted in the District Boards passing a resolution restoring the special assessments. The case was dismissed by stipulation of the parties. Lord Abbett alleges that the suit required it to incur substantial expense.

Around September 25, 2012, Southern Farms informed IGT,[7] the holder of the mortgage on the bingo facility, that Southern Farms intended to foreclose on the entire 375-acre property and to conduct a sale on October 23, 2012.    It conducted the sale as planned on the courthouse steps and sold the property to itself.  Lord Abbett asserts that the foreclosure is invalid and due to be set aside as it concerns all land at Country Crossing that has been released from Southern Farms's mortgage or amended mortgage.   Further, Lord Abbett claims that the foreclosure is invalid because of the statutorily created superior lien in favor of itself that resulted from the Districts' non-collection and payment of special assessments to the Indenture Trustee.

## B.    **Procedural History**

Lord Abbett filed this suit in December 2012.  Defendants both moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Docs. # 21, 22.) Lord Abbett sought leave from the court to amend its complaint to add more substantive allegations and two additional counts.  (Doc. # 28.)  The court granted Lord Abbett's motion and denied the pending motions to dismiss as moot.  On July 1, 2013, Lord Abbett filed its amended complaint which requests: (1) a declaratory judgment concerning (a) lien priority as to the entire property and (b) the validity of the rescission of the mortgage release as to the bingo facility property (Count

---

[7] IGT is not otherwise defined in the amended complaint.

One); (2) relief for wrongful foreclosure (Count Two); (3) equitable relief to pierce the corporate veil and find Southern Farms to be the alter ego of Mr. Givens (Count Three); (4) relief for fraudulent transfer (Count Four); and (5) relief for tortious interference with contract (Count Five).  (Doc. # 33 at 23–28.)  Defendants filed the instant motions to dismiss on July 22, 2013.  (Docs. # 34, 35.)  Lord Abbett responded (Doc. # 36), incorporating much of its response to the original motions to dismiss, (*see* Doc. # 26).

## IV.  DISCUSSION

To the extent that Defendants dispute Lord Abbett's allegations as untrue or unfounded, these objections are ignored as they do not go to the issue presented by Rule 12(b)(1) and Rule 12(b)(6) motions to dismiss − *i.e.*, whether the pleading alleges subject matter jurisdiction and whether its claims, if true, would entitle Lord Abbett to relief.  Only arguments comporting with the relief available in Rule 12(b) are pertinent.

### A.    <u>Count One: Declaratory Relief</u>

As to Count One, Southern Farms contends that Lord Abbett fails to allege that it has a stake in a lien priority controversy.  It accuses Lord Abbett of "attempting to secure an advisory opinion related to the lien priority" dispute between the Improvement District and Southern Farms.  (Doc. # 35, at 5.)

Southern Farms asserts that Lord Abbett lacks standing to seek a remedy pursuant to 28 U.S.C. § 2201 because it lacks a stake in the alleged lien controversy.[8][9]

Incorporating by reference its arguments in response to Defendants' motions to dismiss the original complaint, (*see* Doc. # 26, at 4–10), Lord Abbett responds that there is an "actual controversy" under Article III of the Constitution and 28 U.S.C. § 2201, and thus, it has standing to seek a declaratory judgment. Lord Abbett asserts that it has a first-priority lien against the property by virtue of its right to the unpaid special assessments owed on the property. Lord Abbett cites Ala. Code § 11-99A-31(b) which provides that "[*a*]*ll assessments . . . shall constitute . . . a lien against each lot or tract of land* as provided in the assessment and shall have priority over all other liens, other than liens for ad valorem taxes." Further, Lord Abbett quotes § 11-99A-36, which authorizes an improvement district to pledge, or provide as security for debt, assessments to bondholders. That section explains that "[a]ssessments may be pledged to an issue of bonds, and if pledged, the pledge *shall be deemed a perfected, first claim by the bondholders*, or

---

[8] Southern Farms's motion as to Count One is a Rule 12(b)(1) facial attack on subject matter jurisdiction.

[9] The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28. U.S.C. § 2201(a) (exceptions omitted). The Supreme Court has interpreted this statute to require that a controversy between parties be "definite and concrete, touching the legal relations of parties having adverse legal interests" and that it request "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2007) (internal quotation marks omitted).

trustee on behalf of the bondholders, against the assessments . . . ." *Id.* (emphasis added). Southern Farms made no argument in reply to contradict Lord Abbett's interpretation of its rights as lienholder.

These Alabama statutes granting to bondholders rights as first-priority, secured creditors undermine Southern Farms's contention that Lord Abbett is not a competing lienholder with rights adversarial to Southern Farms's rights as mortgagee. And if Lord Abbett is a lienholder, an actual controversy exists between it and Southern Farms, which grants Lord Abbett standing to seek declaratory relief pursuant to the Declaratory Judgment Act. Consequently, on the information presently available, Southern Farms's motion to dismiss Count One for lack of subject matter jurisdiction is due to be denied.

## B.   <u>Count Two: Wrongful Foreclosure</u>

Similarly, Southern Farms moves for dismissal of Lord Abbett's wrongful foreclosure claim and argues that Lord Abbett does not allege that it possessed any lien or ownership interest in the Country Crossing property. Lord Abbett responds by referencing its previous responsive briefing. There, it reasserted its allegations that Southern Farms's foreclosure was wrongful because (1) it deprived Lord Abbett of its statutorily created, priority lien interest in the property by virtue of the unpaid assessments; (2) the foreclosure was without a legal basis with respect to the bingo facility property and the District Utility Property because Southern

15

Farms released those parcels from its mortgage lien; and (3) the District Utility Property specifically was mortgaged to the Indenture Trustee of the Bonds in 2010 pursuant to the First Supplemental Indenture.

Lord Abbett adds in its current responsive briefing that "[a] wrongful foreclosure claim exists where a mortgagee" such as Southern Farms "uses the power of sale given under a mortgage for a purpose other than to secure the debt owed by the mortgagor."  (Doc. # 36, at 11 (quoting *Jackson v. Wells Fargo Bank, N.A.*, 90 So. 3d 168, 171 (Ala. 2012) (internal quotation marks omitted)).)   It further contends that a foreclosure sale by a party that lacks a mortgage interest is void, (*see* Doc. # 36, at 12 (citing *Campbell v. Bank of Am., N.A.*, ___ So. 3d ____, 2012 WL 2362615 (Ala. Civ. App. 2012))), and thus, Southern Farms's foreclosure sale is void, and wrongful, as to the portions of the Country Crossing property to which Mr. Givens executed partial mortgage releases.

Lord Abbett has alleged facts suggesting that Southern Farms's foreclosure sale was wrongful for at least two reasons.  Southern Farms's motion to dismiss Count Two for failure to state a claim is due to be denied.

### C.   <u>Count Four: Fraudulent Transfer</u>

Defendants argue that Lord Abbett's fraudulent transfer claim must be dismissed because Lord Abbett does not allege that it was a "creditor" entitled to a "right to payment" from Southern Farms, a "debtor."  (*See* Doc. # 35, at 8 "If a

16

plaintiff cannot establish that they maintain a right to payment from a defendant, the [p]laintiff cannot state a [c]laim as a [c]reditor or attempt to hold another party liable as a [d]ebtor under the [Alabama Uniform Fraudulent Transfer Act]." (quotation marks omitted).)   Thus, Defendants imply that if Lord Abbett has a wrongful transfer claim, it is properly against Resorts Development Group II – not Southern Farms.   Further, Defendants argue that there is no allegation Southern Farms *made* a fraudulent transfer.

Lord Abbett responds by pointing out that the statute defining fraudulent transfer "provides that remedies for fraudulent transfer are not focused on the debtor, but on the transferee."   (Doc. # 26, at 17.)   Hence, it makes no difference that Southern Farms received rather than made allegedly fraudulent transfers.   *See* Ala. Code § 8-9A-7 (allowing for avoidance of the transfer, attachment against the transferred asset, injunctive relief against the transferee regarding disposition of the asset, or appointment of a receiver to command the asset); *see also id.* at § 8-9A-8 (discussing defenses available to transferees); *Roberson v. Johnson*, 950 So. 2d 317 (Ala. Civ. App. 2006) (allowing creditor-plaintiff to proceed with cause of action against wrongful transferee-defendant in a case where the "debtor" was not a party to the action).

Accordingly, because Alabama law allows fraudulent transfer suits against wrongful transferees, and because Defendants' offer no convincing arguments as to

why Lord Abbett may not sue them for fraudulent transfer, the motions to dismiss Count Four are due to be denied.

## D.   **Count Five: Tortious Interference with Contract**

Defendants contend that Lord Abbett failed to plead facts supporting a claim for tortious interference with contract.  Defendants ignore the amended complaint's express explanation of the nature of Lord Abbett's claim.  (*Compare* Doc. # 33, at ¶ 82 ("The wrongful acts and omission of Givens that caused the District Board Members to pass the Resolution [rescinding the special assessments] constitute intentional acts of tortious interference . . . with [Lord Abbett's] contractual rights.") *with* Doc. # 35, at 9 ("Plaintiff seems to be alluding to Southern Farms' efforts to clarify the nature and amount of funds actually spent to improve the property while under the ownership and control of . . . Ronnie Gilley.").)[10] Defendants also assert that the complaint fails to allege that Mr. Givens acted with the intent to interfere with Lord Abbett's contractual rights, but this assertion is untrue.  (*See* Doc. # 33, at ¶¶ 57–59 (ascribing intent to Mr. Givens).)

In Alabama, the elements of tortious interference with contract are: (1) the existence of a protectable contract; (2) defendant's knowledge of the contract; (3) defendant's status as a stranger to that contract; (4) defendant's intentional interference with the contract; and (5) plaintiff's damage.  *See Booth v. Newport*

---

[10] It is unclear what Defendants are talking about.

*Television, LLC*, 111 So. 3d 719, 727 (Ala. Civ. App. 2011).  Lord Abbett has alleged facts substantiating a claim for tortious interference with contract, and Defendants fail to expose a deficiency in the pleading.  Defendants' motions to dismiss are due to be denied as to Count Five.

## E.     "Count Three": Piercing the Corporate Veil

Lastly, Defendants contest Lord Abbett's allegations that Mr. Givens should be held personally responsible for Southern Farms's alleged torts.  Lord Abbett generally claims that Southern Farms is an alter ego of Mr. Givens, Mr. Givens misused the corporate form to Lord Abbett's detriment, and it would be inequitable to permit Mr. Givens to hide behind the corporation to avoid liability for his tortious conduct.  (*See* Doc. # 33, at 25–26.)  Ultimately, to succeed on that alter ego theory of liability, Lord Abbett would have to prove that (1) Mr. Givens had complete control of Southern Farms such that at the time of the tortious conduct, Southern Farms had no will of its own; (2) Mr. Givens misused his control of Southern Farms as evidenced by fraud or the violation of some affirmative legal duty; and (3) the misuse of his control proximately caused Lord Abbett's harm or loss. *See Heisz v. Galt Indus., Inc*., 93 So. 3d 918, 930 (Ala. 2012).

Defendants seek dismissal of Lord Abbett's "Count Three" where Lord Abbett asks the court to pierce the corporate veil and hold Mr. Givens liable for Southern Farms's torts.  Defendants argue that the amended complaint fails to

allege facts supporting the inference that Mr. Givens "misused" the corporate form of Southern Farms and that the pleading fails to provide them with notice as to what actions Mr. Givens took that warrant veil-piercing.  Lord Abbett responds by clarifying that its request to pierce the corporate veil of Southern Farms is not a stand-alone claim, but an equitable remedy, and before the court can afford the remedy, Lord Abbett must first prevail on a substantive claim against Southern Farms.  *See Stephens v. Fines Recycling, Inc*., 84 So. 3d 867, 877 (Ala. 2011).  Further, Lord Abbett asserts that its allegations of Mr. Givens's misuse of Southern Farms are specific enough at this stage of the proceedings.

Because this is a review of a motion to dismiss pursuant to Rule 12(b)(6), the issue is not whether Lord Abbett can show that it will ultimately succeed in piercing the corporate veil of Southern Farms, but whether the allegations in the pleading are enough to permit Lord Abbett to proceed with discovery to attempt to prove that piercing is an appropriate remedy in this case.  *See Jackam v. Hosp. Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1579–80 (11th Cir. 1986).  Lord Abbett has alleged that Mr. Givens alone was behind Southern Farms and that he was personally involved in the alleged torts.  The court finds that the pleading alleges sufficient facts to satisfy Rule 8(a)'s notice-pleading requirements as to Mr. Givens.  Furthermore, because veil-piercing itself is not an independent cause of action, but a remedy available to the plaintiff if its substantive claims are

successful, Rule 12(b)(6) is an inappropriate procedural avenue to "dismiss" or otherwise attack Count III's request to pierce the corporate veil of Southern Farms.[11]

## V.  CONCLUSION

For the foregoing reasons, the court has denied Defendants' motions to dismiss the amended complaint.

DONE this 19th day of February, 2014.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE

---

[11] And, to the extent that Defendants have asserted that Mr. Givens's actions were all taken on behalf of Southern Farms "to protect the security interests maintained by the corporation by virtue of [its] note and mortgage," (Doc. # 34, at 3), this is a defense which Defendants are entitled to raise in the litigation.  But it is not an argument for dismissal of the amended complaint.