IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LORD ABBETT MUNICIPAL INCOME FUND, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 1:12-CV-1099-WKW [WO] |
| SOUTHERN FARMS, INC., *et al.*, | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are motions for summary judgment filed by Defendants Southern Farms, Inc. (Doc. # 50) and John Keith Givens (Doc. # 52). Upon consideration of the parties' arguments, the evidence, and the relevant law, the motions are due to be denied.

## I. JURISDICTION AND VENUE

The court exercises subject-matter jurisdiction over the instant claims pursuant to 28 U.S.C. § 1332(a)(1). The parties do not contest personal jurisdiction or venue.

## II. STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

court must view the evidence and the inferences from that evidence in the light most favorable to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

On a motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id*. If the moving party does not bear the trial burden of production, it may assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the moving party meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute of material fact exists as to each of its claims for relief. *Celotex*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return

a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. BACKGROUND

This case arises from the development of Country Crossing, a mixed-use entertainment complex in Houston County, Alabama.  The brainchild of developer Ronnie Gilley ("Gilley"), Country Crossing offered patrons a variety of diversions from the workaday routine.  The original scheme contemplated a theater, an RV park, restaurants, a bed and breakfast, and, controversially, an electronic bingo facility.

Country Crossing showed early promise.  It garnered the support of several successful country recording artists, including the late George Jones.  But in the wake of Governor Bob Riley's efforts to quell gambling in the state, the project swiftly met its demise.  As the neon lights faded over southern Houston County, creditors were left to wonder who would fill Country Crossing's shoes.[1]

**A.**   **Facts**

In the action at bar, Plaintiff Lord Abbett Municipal Income Fund, Inc. ("Lord Abbett") asserts two claims against Defendants Southern Farms, Inc. ("Southern Farms") and John Keith Givens ("Givens").  The factual background of

---

[1] *See* George Jones, *Who's Gonna Fill Their Shoes* (Epic Records 1985).

these claims were addressed at length in a previous opinion (Doc. # 44), but the complex nature of the events calls for a recitation.

### 1.    *Property Acquisition*

Before Gilley could begin building, he needed to acquire suitable property. He dispersed ownership of the Country Crossing project among three separate limited liability companies (the "Country Crossing Entities"), one of which would take a central role in the Southern Farms transaction.   Resorts & Entertainment Group II, LLC was responsible for management and operations.    Country Crossing, LLC oversaw issues of intellectual property and licensing.    Resorts Development Group II, LLC ("RDG-II") handled acquisition of real property and construction.   Each of the Country Crossing Entities issued ownership shares in the form of membership units.

In October of 2008, RDG-II made arrangements to purchase a 375-acre parcel of land from Southern Farms, an entity wholly owned by Givens.   They agreed on a purchase price of $19,840,000.    Southern Farms received additional consideration in the form of five percent of the membership units of each of the Country Crossing Entities.    Pursuant to the Promissory Note and Security Agreement,[2] Southern Farms financed the transaction at zero percent interest.

---

[2] In contemplation of the land transaction, RDG-II and Southern Farms entered into a Land Purchase Agreement (Doc. # 59-1, at 12–22), a Promissory Note and Security Agreement (Doc. # 59-1, at 23–31), a Mortgage Agreement (Doc. # 59-1, at 32–50), and several Guaranty Agreements (Doc. # 59-1, at 51–72).

RDG-II granted Southern Farms a first priority mortgage on the property, but Southern Farms agreed that it would subordinate its interest to those of lenders financing future improvements to the property.   As additional security for repayment of the purchase price, Southern Farms received personal guaranties from Gilley and associated business entities.   Gilley and related entities also pledged to Southern Farms a twenty-five percent equity interest in the Country Crossing Entities.

After RDG-II finalized the land purchase transaction, it became insolvent. An independent appraisal of the property revealed a fair market value of approximately $3,000,000.  Because the purchase price and the debt obligations were substantially higher than the actual value of the property, RDG-II's assets exceeded its liabilities.  RDG-II had no steady source of income, and it lacked sufficient cash flow to make the payments contemplated under the Land Purchase Agreement.

## 2. *Bond Obligations*

To facilitate Country Crossing's development, the Houston County Commission created two districts:  (1) the Cooperative District of Houston County – Country Crossing Project (the "Cooperative District"), and (2) the Improvement District of Houston County – Country Crossing Project (the "Improvement District") (collectively the "Districts").   The Districts were authorized to issue

bonds to finance infrastructure improvements on the Country Crossing property. In 2009, the Districts issued the first series of obligation bonds, which totaled $21,325,000.  They issued a second series of bonds, which totaled $7,735,000, in 2010.  Lord Abbett purchased both series after their issuance.  These bonds were to be repaid from the collection of assessments on the Country Crossing property and fees from related business activities.   The Cooperative District successfully petitioned the Circuit Court of Houston County for validation of all bonds, fees, assessments, and means of repayment.

Alabama state officials eventually determined that the electronic bingo activities at Country Crossing constituted illegal slot machine gambling.  All bingo operations ceased, and Country Crossing closed its doors.   It has not since reopened.  Because there has been no economic activity at Country Crossing, and no receipt of assessments, the Districts have not made payments due on the Bonds.

### 3.   *Payments to Southern Farms*

RDG-II made several payments to Southern Farms after the initial land purchase.  The payments can be categorized as those relating to the parcel on which the electronic bingo facility would be built (the "Bingo Facility Property"), and those relating to the parcel on which the district utility improvements would be made (the "District Utility Property").  Lord Abbett argues that these payments,

which allegedly total $4,700,000, can be set aside as fraudulent transfers made with the intent to hinder, delay, or defraud creditors.

### a.    Bingo Facility Property

Because it lacked cash flow, RDG-II needed loans to finance construction of the bingo facility. It made arrangements to obtain a loan from businessman Milton McGregor ("McGregor") in the amount of $5,000,000 (the "McGregor Loan"). RDG-II and McGregor, along with other parties, executed a Construction Financing Agreement, the terms of which required RDG-II to obtain a release of the Southern Farms mortgage as to the Bingo Facility Property. Southern Farms was already obligated, under the terms of the Land Purchase Agreement, to subordinate its mortgage interest in favor of lenders who financed Country Crossing property improvements. Despite this pre-existing subordination obligation,[3] Southern Farms required RDG-II to make principal reduction payments before it released its mortgage interest as to the bingo facility site. Pursuant to the Principal Reduction Agreement between RDG-II and Southern Farms, RDG-II would make payments totaling $500,000 to Southern Farms. Those payments were to be applied to the outstanding principal on the land purchase promissory note. In exchange, Southern Farms would release its

---

[3] It is unclear what advantage the parties gained from releasing the mortgage on the bingo facility as opposed to subordinating the mortgage. Southern Farms was obligated to subordinate its interest to parties financing improvements. (Doc. # 59-1, at 14.) The McGregor Loan nevertheless depended on a release of the Southern Farms mortgage as to the Bingo Facility Property. (Doc. # 59-1, at 270.)

mortgage as to the bingo facility site. RDG-II made a $300,000 payment to Southern Farms on January 26, 2009. It then made a $200,000 payment to Southern Farms on February 25, 2009.

The McGregor Loan was originally set to close on April 30, 2009. Before the closing could take place, however, Governor Riley took action to suppress gambling activity in Alabama. Due to complications from this anti-gambling effort, RDG-II and McGregor extended the loan's closing date to September 30, 2009. In June of 2009, before the loan could be finalized, RDG-II defaulted on its obligations under the Land Purchase Agreement. Southern Farms and RDG-II then executed an Amended and Restated Promissory Note and Security Agreement. Southern Farms had not executed the mortgage release, despite the payment of $500,000, because closing had been delayed.

Under the terms of the amended note, RDG-II was required to make an initial loan payment in the amount of $1,180,486. The new agreement also required that RDG-II pay eighteen percent interest on $3,000,000 of the original purchase price, and that Southern Farms would only release its mortgage on the bingo facility parcel after RDG-II made the initial $1,180,460 payment. The new agreement did not apply the "principal reduction" payments, totaling $500,000, to the outstanding land purchase principal. Instead, it treated these payments as mere inducements for Southern Farms to agree to the Amended Mortgage. RDG-II paid,

in essence, half a million dollars to refinance the original promissory note on terms more favorable to Southern Farms. On August 19, 2009, RDG-II made the initial payment of $1,180,486, and Southern Farms finally released the mortgage as to the bingo facility site.

### b.    District Utility Property

RDG-II also made payments to Southern Farms relating to the District Utility Property.  The Cooperative District was scheduled to issue municipal bonds, the proceeds from which would be used to make public infrastructure improvements benefitting the Country Crossing project.  As a part of this transaction, RDG-II was required to convey the District Utility Property to the Cooperative District unencumbered by the Southern Farms mortgage.[4]  RDG-II thus needed Southern Farms to execute another release.

Before it would provide the release, Southern Farms demanded an unscheduled $3,000,000 payment from RDG-II, which would be applied to the land purchase principal.  RDG-II lacked the funds necessary to make such a substantial payment, so it obtained a loan from Specialized Services, Inc. in the amount of $2,235,000.  In November of 2009, it remitted these funds to Southern Farms and executed yet another promissory note, in the amount of $765,000, to

---

[4] Again, in light of the subordination obligation, the reason for a full release is unclear. Taylor stated that RDG-II believed this release to be consistent with Southern Farms's subordination obligation.  (Taylor Affidavit, Doc. # 59-1, at 11.)

cover the remaining portion of the demanded payment.  The terms of the promissory note required interest in the amount of $35,000 per week.  RDG-II eventually extinguished this promissory note when it made a payment to Southern Farms on December 8, 2009, in the amount of $855,714.

**B.    Procedural History**

After Lord Abbett filed the initial complaint in December of 2012, Southern Farms and Givens moved for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Lord Abbett sought and was granted leave to amend its complaint.  Southern Farms and Givens again filed a motion to dismiss, which was denied.

In June of 2015, Southern Farms and Givens filed motions for partial summary judgment (Docs. # 50 and 52).  Southern Farms filed a supporting brief (Doc. # 51), on which Givens relies to support his own motion (*see* Doc. # 52, at 3).  Lord Abbett later agreed to dismiss several claims raised in the Amended Complaint.  (*See* Doc. # 64.)   In the currently operative Second Amended Complaint (Doc. # 65), Lord Abbett only asserts two claims against Southern Farms and Givens.  Count One alleges that Givens can be held personally liable for the actions of Southern Farms by operation of the doctrine of piercing the corporate veil.  Count Two alleges that payments made by RDG-II to Southern Farms can be avoided as fraudulent transfers.

Southern Farms and Givens have not altered their motions for summary judgment in response to the filing of the Second Amended Complaint. Their arguments regarding the remaining claims apply with equal force to the new pleading. Southern Farms seeks summary judgment on both the claim for fraudulent transfer and the claim for piercing the corporate veil. (*See* Doc. # 50.) Givens seeks summary judgment only on the claim for fraudulent transfer. (*See* Doc. # 52.) Lord Abbett filed a response (Doc. # 58) and a supporting brief (Doc. # 59).[5] Southern Farms and Givens then filed a joint reply (Doc. # 60), which contains a supporting brief. In light of the new pleading, the motions for summary judgment will not be addressed as they relate to dismissed claims.

## IV. DISCUSSION

The claim for fraudulent transfer, which appears in Count Two,[6] is addressed first. The transfers at issue include: (1) $300,000 on January 26, 2009, (2) $200,000 on February 25, 2009, (3) $1,180,000 on August 19, 2009, (4) $2,235,238.07 in November of 2009, and (5) $855,714 on December 8, 2009. The claim for piercing the corporate veil, which appears in Count One, is addressed second.

---

[5] Lord Abbett did not move for summary judgment.

[6] The beginning is, ordinarily, the best place to start. There is no need to address the propriety of piercing the corporate veil, however, if Southern Farms is entitled to summary judgment on the issue of fraudulent transfer. If the claimant is unsuccessful on the sole underlying cause of action, there is no liability to impute to the individual. *See* Part IV.B, *infra*. Accordingly, Count Two goes first.

A.   **Fraudulent Transfer**

 In Count Two of the Second Amended Complaint, Lord Abbett alleges that payments made by RDG-II to Southern Farms constitute fraudulent transfers.  The payments at issue were made in connection with RDG-II's efforts to obtain mortgage releases for the Bingo Facility Property and the District Utility Property. Ultimately, Southern Farms is not entitled to summary judgment on this claim.

1.   *Fundamental Elements*

The authority to set aside fraudulent transfers originally derives from the court's equitable powers, but here it is exercised pursuant to an Alabama statute.  If a creditor is successful in establishing the fraudulent nature of a conveyance, it may be entitled to an array of related remedies.  Under the Alabama Fraudulent Transfer Act, these include avoidance of the transfer, attachment against the asset, an injunction against further disposition, and receivership.  Ala. Code § 8-9A-7.  In the Second Amended Complaint, Lord Abbett demands a judgment voiding the transfers and prays for damages.

A claim for fraudulent transfer consists of three fundamental elements.  The claimant must establish (1) that there was a creditor to be defrauded, (2) that the debtor intended to defraud, and (3) that there was a conveyance of property out of which the creditor could have realized its claim.  *Champion v. Locklear*, 523 So. 2d 336, 338 (Ala. 1988).  Southern Farms and Givens do not dispute that Lord

Abbett is a creditor by virtue of its status as a bondholder.[7]  *See* Ala. Code § 11-81-224 (providing that an order validating bonds shall be conclusive as to the existence of an enforceable obligation to the bondholder); *see also* Bond Validation Order (Doc. # 59-2, at 184).  Defendants also do not dispute that Lord Abbett's claims against RDG-II, for unpaid principal and interest on the bonds, could have been realized out of the money RDG-II paid to Southern Farms in connection with the Bingo Facility Property and District Utility Property mortgage releases.  *See* Ala. Code § 11-99A-17 (providing that all proceeds of the assessments allocable to the bonds are pledged to the bondholder).  Accordingly, the disposition of this motion turns on RDG-II's intent to defraud.[8]

Recognizing that the debtor's intent is often difficult to prove, Alabama law provides for two varieties of fraudulent transfers:  actual and constructive.  An actual fraudulent transfer occurs where the debtor conveys assets with "actual intent to hinder, delay, or defraud any creditor of the debtor."  Ala. Code § 8-9A-4(a).  A constructive fraudulent transfer occurs, irrespective of actual intent, where

---

[7] Southern Farms and Givens do argue that they are not in a debtor-creditor relationship with Lord Abbett.  (*See* Doc. # 60, at 8.)  But they do not dispute Lord Abbett's contention that it is a creditor of RDG-II as a result of the bond issuance.  Lord Abbett argued in its brief that it is a creditor by virtue of Ala. Code § 11-81-224.  (Doc. # 59, at 8–9 ("[T]here can be no question that Lord Abbett is a creditor of RDG-II with a lien against the Property.").)  Defendants did not address this argument in their reply.

[8] In addition to the ample evidence Lord Abbett produced, Defendants must contend with the fact that issues of "intent, motive, and subjective feelings" are ill-suited for disposition on a motion for summary judgment.  *Loveless v. Graddick*, 325 So. 2d 137, 149 (Ala. 1975).

an insolvent debtor conveys assets to another without receiving valuable consideration in exchange.  Ala. Code § 8-9A-5.

To survive this motion for summary judgment on actual intent, Lord Abbett must present sufficient evidence to establish the existence of a genuine dispute of material fact as to RDG-II's intent to defraud.  Lord Abbett succeeds.  It offers sufficient evidence to raise triable issues with respect to both actual and constructive fraudulent transfer.

### 2.    *Actual Fraudulent Transfer*

Lord Abbett's evidence suffices to raise a genuine dispute of material fact regarding RDG-II's actual intent to defraud creditors.[9]  When determining whether the debtor made a transfer with "actual intent to hinder, delay, or defraud" creditors, several factors may be considered.  Ala. Code § 8-9A-4.  These factors, or badges of fraud, include whether (1) the transfer was to an insider, (2) the debtor retained possession of the property after the transfer, (3) the transfer was

---

[9] In their Joint Reply, Defendants make much ado about the purported irrelevance of the transferee's intent to defraud.  (Doc. # 60, at 8.)  It is true, under the Alabama Fraudulent Transfer Act, that the claimant must establish intent to defraud on the part of the *debtor* to make out a prima facie case.  Ala. Code § 8-9A-4(a).  Defendants' arguments are well taken, but with the following caveat.

There are instances in which the transferee's intent to defraud is in fact relevant.  *See Dial v. Morgan*, 525 So. 2d 1362, 1364 (Ala. 1988) (holding that the mutual fraudulent intent of the debtor and the transferee must be shown to set aside a fraudulent conveyance).  And where the badges of fraud enumerated in the Fraudulent Transfer Act are considered, the transferee's dealings with the debtor are most relevant.  *See* Ala. Code § 8-9A-4(b).  Because the debtor's subjective state of mind rarely will emerge as a matter of direct evidence, the statute provides this objective means of inferring intent.  Here, Defendants' relationship with RDG-II and the motivations behind its dealings with the same are properly under consideration.

concealed, (4) the debtor had been threatened with suit prior to the transfer, (5) the transfer was of substantially all of the debtor's assets, (6) the debtor absconded, (7) the debtor concealed assets, (8) the value of the consideration the debtor received was comparable to the value of the asset transferred, (9) the debtor was insolvent at the time of the transfer or shortly thereafter, (10) the transfer took place before or shortly after the debtor incurred a substantial debt, and (11) the debtor transferred essential business assets to a lienor who then transferred the assets to an insider. *Id.* Though these objective factors may come to bear on the actual intent inquiry, they are not conclusive. *In re Earle*, 307 B.R. 276, 293 n.9 (Bankr. S.D. Ala. 2002). Lord Abbett has offered evidence establishing that the payments RDG-II made to Southern Farms bore several of these badges of fraud. The following issues relate to Lord Abbett's claim: (a) whether the transfer was to an insider; (b) whether the debtor was threatened with suit; (c) whether the value of the asset transferred exceeded the value of consideration received; and (d) whether the debtor was insolvent.

### a.    Transfer to an Insider

First, Lord Abbett has evidence from which a reasonable finder of fact could determine that RDG-II made transfers to an insider. An "insider" includes, *inter alia*, a person in control of the debtor. Ala. Code § 8-9A-1(8). According to

Chuck Taylor ("Taylor"),[10] former Chief Financial Officer of Country Crossing, Southern Farms and Givens enjoyed access to inside information about RDG-II. (Taylor Aff., Doc. # 59-1, at 10.)  Taylor testified that the stock pledges, mortgage, and guaranties gave Southern Farms and Givens substantial leverage to influence RDG-II's decisions.  (Taylor Aff., Doc. # 59-1, at 10.)  He further averred that Southern Farms and Givens used their influence to force RDG-II to make unscheduled payments to Southern Farms at the expense of other creditors. (Taylor Affidavit, Doc. # 59-1, at 10.)  Lord Abbett's evidence also reveals that Givens was included in email correspondence containing "strictly private [and] confidential" information about the Country Crossing project.  (Email Exhibit, Doc. # 59-9.)

It is true, as Defendants note, that Southern Farms did not initially own thirty percent of the membership units of the Country Crossing Entities.   Southern Farms first received title to only five percent of the membership units of each entity as additional consideration for the land purchase transaction.   (Land Purchase Agreement, Doc. # 59-1, at 14.)   Two entities then pledged their

---

[10] Defendants devote a tremendous portion of their reply brief to the value of Taylor's affidavit testimony.  Specifically, they decry his testimony as incredible.  The role of the court, on a motion for summary judgment, is not to weigh the probative value of conflicting evidence. *Lane v. Celotex Corp.*, 782 F.2d 1526, 1528 (11th Cir. 1986).  This invitation to invade the province of the finder of fact will be declined.  The proper course of action is merely to review the record, in light of the controlling legal principles, to determine whether the nonmoving party has presented sufficient evidence to raise a genuine dispute of material fact.  *See id.*  With respect to the issue of whether RDG-II intended to defraud, there is ample evidence supporting the existence of such a factual dispute.

collective twenty-five percent interest as collateral securing the purchase price of the property.[11]   (Pledge Agreements, Doc. # 59-1, at 74.)   But the fact that Southern Farms initially held title to only five percent of the Country Crossing venture does not indicate that Defendants lacked capacity to control RDG-II.  The Pledge Agreement granted Southern Farms a lien on the pledged twenty-five percent share, clouding title to the Country Crossing Entities.  A lienor's interest, though not commensurate with outright ownership, nonetheless places the lienor in a position of power *vis a vis* the debtor.

When RDG-II memorialized the Land Purchase Agreement, it did so with full knowledge of its own insolvency.  (Taylor Affidavit, Doc. # 59-1, at 7.)  It conducted business under the spectre of foreclosure.  It was surely aware that its failure to satisfy the land purchase obligations would result in Southern Farms' ownership of thirty percent of the venture.  Perhaps this awareness colored its response when Southern Farms demanded unscheduled payments.  Perhaps, by virtue of the looming risk of delinquency, Southern Farms and Givens did enjoy substantial control over the operations of RDG-II.   A finder of fact could

---

[11] Southern Farms eventually exercised its pledge rights, though the date on which it did so is unclear.  (Givens Deposition, Doc. # 59-10, at 8.)  It is evident that Southern Farms took ownership of a majority of the Class B membership units of RDG-II, which included voting rights, at some time before February of 2012.  (Givens Deposition, Doc. # 59-10, at 10–14.)  It is not clear from the record how Southern Farms came to possess a majority of the ownership units, given that the potential ownership based on the Land Purchase Agreement and the Pledge Agreements amounted to a total of only thirty percent of the Class B membership units.  In his deposition, however, Givens confirmed that Southern Farms eventually held fifty-five percent of the Class B membership units.  (Givens Deposition, Doc. # 59-10, at 14.)

reasonably conclude, based on this evidence, that Southern Farms and Givens used their knowledge and potential ownership to exert influence such that they were in control of RDG-II.  Whether the evidence establishes this fact need not be decided. At this point, there is no need to venture further than to determine whether the nonmoving party has raised a genuine dispute of material fact.

Even if Southern Farms and Givens were not in complete control of RDG-II, control is not the only means of establishing Defendants' insider status.  The list of insiders provided in the definition section of the Alabama Fraudulent Transfer Act is not exhaustive.  *See* Ala. Code § 8-9A-1 (stating that the definition of insider "includes" the enumerated examples); *Earle*, 307 B.R. at 291 (noting that the list is merely illustrative).   In the bankruptcy context, for example, "insider" includes anyone "so closely related to a debtor that any deal between them will not be considered an arm's length transaction and will be subject to close scrutiny." *Insider*, BLACK'S LAW DICTIONARY (10th ed. 2014).  Lord Abbett's evidence is sufficient to allow the inference that Defendants were so closely related to RDG-II that the conveyances between them should be subject to heightened scrutiny.

### b.    Debtor was Threatened with Suit

Lord Abbett also offers evidence to show that RDG-II had been threatened with suit before it made payments to Southern Farms.  *See* Ala. Code § 8-9A-4(b)(4).   It argues that the First Amendment to the Construction Financing

Agreement supports this contention (Doc. # 59-1, at 283).   In that amended agreement, which related to the McGregor Loan, Southern Farms and Givens acknowledged that construction financing was difficult to procure in light of Governor Riley's anti-gaming task force.   (First Amendment to the Construction Financing Agreement, Doc. # 59-1, at 285.)   That this representation is evidence of a threat to sue RDG-II is a dubious proposition.   It is well established in the evidence that Governor Riley took certain actions intended to stifle electronic bingo activity.   But neither the existence of the task force nor the difficulty of obtaining construction financing is sufficient to establish that the state actually threatened to take legal action against RDG-II, Gilley, or any related entity.

Even if the First Amendment to the Construction Financing Agreement does not establish that the state actually threatened RDG-II with a lawsuit, this evidence nevertheless speaks to the issue of RDG-II's intent to hinder, delay, or defraud creditors.   All the circumstances under which RDG-II made the disputed payments to Southern Farms are relevant.   *See Earle*, 307 B.R. at 293 n.9 ("'[A]ctual fraudulent intent requires a subjective evaluation of the debtor's motive.' Although consideration of the objective factors has a bearing 'on whether constructive fraudulent intent exists, . . . it is not conclusive . . .'") (citation omitted) (quoting *In re Jeffery Bigelow Design Grp.*, 956 F.2d 479, 484 (4th Cir. 1992)).   The fact that state law enforcement officials deemed a large portion of the

Country Crossing business to be illegal may have motivated the payments at issue, making it more likely that RDG-II made transfers with fraudulent intent. This fact contributes to the finding that there exists a genuine dispute of material fact with respect to RDG-II's intent to defraud creditors.

### c.       Payment Exceeded Value of Consideration Received

Lord Abbett further offers evidence indicating that the money paid to Southern Farms far exceeded in value any consideration RDG-II received in return. Taylor testified that Givens forced RDG-II to make an unscheduled payment of $3,000,000 before releasing the Southern Farms mortgage as to the District Utility Property. (Doc. # 59-1, at 11.) He also stated that RDG-II acquiesced in this payment despite its understanding that the release fell within the scope of Southern Farms's subordination duty under the Land Purchase Agreement. (*See* Doc. # 59-1, at 11.) Because Southern Farms was required to subordinate its interest under the original agreement, the value of its release paled in comparison to the value of the cash payment it received. This evidence also supports a finding that there exists a genuine dispute of material fact precluding summary judgment.

### d.       Debtor Was Insolvent at Time of Transfer

Finally, with respect to the badges of fraud under Ala. Code § 8-9A-4(b), Lord Abbett presents evidence that RDG-II was insolvent at the time it made the payments in question to Southern Farms. Taylor testified that RDG-II lacked

sufficient cash flow to make payments to Southern Farms under the Land Purchase Agreement.   (Taylor Aff., Doc. # 59-1, at 7.)   Lord Abbett bolsters Taylor's testimony with RDG-II's balance sheets (Doc. # 59-1, at 90) and Trends Report (Doc. # 59-1, at 123).  These documents reveal that RDG-II had little cash flow or income.  And as soon as RDG-II signed the Land Purchase Agreement, according to Taylor, its liabilities greatly exceeded its assets.  (Taylor Aff., Doc. # 59-1, at 8.) This unrebutted evidence adequately supports a factual finding that RDG-II was insolvent at the time it made the payments.

Taken together, these evidentiary submissions are sufficient to raise a genuine dispute of material fact regarding RDG-II's intent to defraud its creditors. They suggest that RDG-II made transfers to an insider, that the value of the transfers exceeded the consideration it received in exchange, and that RDG-II was insolvent at the time it made the transfers.  They also shed light on the climate of uncertainty in which RDG-II made decisions about its financing, and on the opportunities for manipulation thus precipitated.   Because Lord Abbett has presented sufficient evidence to raise a genuine dispute of material fact as to RDG-II's intent to defraud creditors, summary judgment is improper.

### 3.    *Constructive Fraudulent Transfer*

Lord Abbett's evidentiary submissions are also sufficient to support a factual finding that RDG-II engaged in constructive fraudulent transfer.  That theory,

codified in the Alabama Fraudulent Transfer Act, provides that a creditor can state a claim for fraudulent transfer without proving the debtor's intent to defraud. Ala. Code § 8-9A-5. Under § 8-9A-5(a), Lord Abbett must establish (1) that its claim arose before the transfers were made, (2) that RDG-II made the transfers without receiving reasonably equivalent value in exchange, and (3) that RDG-II was insolvent at the time of the transfers or became insolvent as a result of the transfers. Ala. Code § 8-9A-5(a). Under § 8-9A-5(b), Lord Abbett must establish (1) that its claim arose before the transfers were made, (2) that the payments to Southern Farms constituted transfers to an insider for an antecedent debt, (3) that RDG-II was insolvent at the time of the transfers, and (4) that Southern Farms had reasonable cause to believe the debtor was insolvent. Ala. Code § 8-9A-5(b).

### a.   Relief Under § 8-9A-5(a)

Lord Abbett has submitted sufficient evidence to support a claim under § 8-9A-5(a). The second and third elements of a claim under § 8-9A-5(a) have already been addressed. For the reasons set out in Part IV.A.2.c, *supra*, Lord Abbett has carried its burden on the issue of whether RDG-II made a transfer without receiving reasonably equivalent value. And for the reasons set out in Part IV.A.2.d, *supra*, Lord Abbett has submitted sufficient evidence to support a finding that RDG-II was insolvent at the time it made the transfers. Yet to be

determined is the issue of whether Lord Abbett's claim arose before the transfers took place.

In their Joint Reply, Defendants contend that Lord Abbett has produced "no evidence what so every [sic]" that Lord Abbett's claim arose before RDG-II made the payments at issue. The statute defines "claim" broadly to include "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured, or unsecured . . ." § 8-9A-1(3). Though the evidence it presented is less than overwhelming, Lord Abbett has offered adequate proof to survive this motion for summary judgment.

The record does not reveal the exact date on which Lord Abbett became "holder" of the bonds. The Houston County Commission authorized the bonds by a resolution dated July 13, 2009. (Doc. # 59-2, at 98.) The Circuit Court of Houston County then validated the bonds by an order dated October 1, 2009. (Doc. # 59-2, at 183.) On November 1, 2009, the Districts actually sold the bonds to the Indenture Trustee. (Trust Indenture, Doc. # 59-2, at 6.) Lord Abbett stated in its answers to interrogatories propounded by Defendants that it purchased the first series of bonds "following" the bond validation order. (Answers to Interrogs., Doc. # 52-14, at 3.) In addition, Craig Wrathell confirmed that Lord Abbett is the holder of the bonds. (Craig Wrathell Dec., Doc. # 59-2, at 3.) There is no doubt

that a bondholder is entitled to the proceeds from the assessments and fees after validation, and thus has a claim within the meaning of the Alabama Fraudulent Transfer Act.  *See* Ala. Code § 11-81-224.

Based on the evidence presented, one could reasonably conclude that Lord Abbett, as a bondholder, has a valid claim for unpaid bond obligations.  One may also reasonably conclude from the record that Lord Abbett's claim on the bond obligations at issue arose on November 1, 2009.[12]  Southern Farms and Givens, the moving parties with the Rule 56 burden, cite no evidence to undermine this reasoning.[13]

The evidentiary submissions establish with greater clarity the dates on which the payments at issue took place.   Three payments clearly occurred prior to November 1, 2009.  RDG-II made the $300,000 payment on January 26, 2009 (Balance Sheets, Doc. # 59-1, at 92), the $200,000 payment on February 25, 2009

---

[12] Lord Abbett presumably knows with certainty the date upon which it purchased the first series of bonds.  It may be able to show, based on evidence to that effect, and in light of the controlling legal principles, that its claim arose on some date earlier than November 1, 2009.  For purposes of this summary judgment motion, and viewing the evidence in the light most favorable to Lord Abbett, the line must be drawn at November 1, 2009.  This is the date upon which the Cooperative District actually agreed to issue bonds to the Indenture Trustee.  And without more evidence or briefing on the issue, it cannot be concluded that Lord Abbett's right to payment arose any sooner.

[13] In fact, Defendants only make reference to one piece of evidence in support of their motion for summary judgment on the issue of fraudulent transfer.  They cite the Southern Farms Affidavit, which states, in conclusory fashion, that payments made to Southern Farms were pursuant to the land purchase agreements, that all payments were part of an arm's length transaction between RDG-II and Southern Farms, and that Southern Farms was not an insider of RDG-II.  (Doc. # 50-1, at 4–5.)  None of these averments rebuts the evidence suggesting that Lord Abbett's claim arose on November 1, 2009.

(Balance Sheets, Doc. # 59-1, at 92), and the $1,180,000 payment on August 19, 2009 (Balance Sheets, Doc. # 59-1, at 98).

The other two payments, however, took place after November 1, 2009.  In his response to interrogatories propounded by Lord Abbett, Givens confirmed that Southern Farms received a $2,235,238.07 payment from RDG-II in November of 2009.  (Answers to Interrogatories, Doc. # 59-5, at 4.)  This amount correlates with the amount of the loan RDG-II received from Specialized Services, which allowed RDG-II to make a $3,000,000 payment under the amended mortgage agreement. (Specialized Services Promissory Note, Doc. # 59-12, at 5.)  The record reveals that RDG-II did not execute the promissory note related to this loan until November 23, 2009.  (Specialized Services Promissory Note, Doc. # 59-12, at 5.) RDG-II made another payment to Southern Farms in the amount of $855,714 on December 8, 2009.  (Balance Sheets, Doc. # 59-1, at 102.)

Viewing all the evidence in the light most favorable to Lord Abbett, Lord Abbett has submitted sufficient evidence to raise a genuine dispute of material fact regarding whether the claim arose before RDG-II made payments to Southern Farms.  The evidence is sufficient to allow a factual finding that the claim arose on November 1, 2009.  The evidence is further sufficient to allow a finding that RDG-II made three payments to Southern Farms after that date.  Accordingly, as it

relates to a claim for relief under § 8-9A-5(a), the motions for summary judgment are due to be denied.

### b.    Relief Under § 8-9A-5(b)

To previal under § 8-9A-5(b), Lord Abbett must show that its claim arose before RDG-II made the transfer, that the transfer was to an insider, that the transfer was for an antecedent debt, that the debtor was insolvent at the time, and that the transferee has reason to believe the debtor was insolvent at the time of the transfer.  As explained in Part IV.A.3.a, *supra*, Lord Abbett has successfully raised a factual dispute as to whether its claim arose before RDG-II made the transfers. For the reasons stated in Part IV.A.2.a, *supra*, Lord Abbett has presented sufficient evidence on the issue of whether RDG-II made the transfers to an insider.  As set forth in Part IV.A.2.d, *supra*, Lord Abbett's evidence is adequate to raise a genuine issue of material fact regarding RDG-II's insolvency.  The remaining issues are whether the transfer was for an antecedent debt, and whether the transferee had reason to believe the debtor was insolvent at the time of the transfer.

As to the antecedent nature of the debt, it is clear from the record that RDG-II made monetary transfers to Southern Farms in satisfaction of the pre-existing land purchase obligation.  (*See* Principal Reduction Agreement, Doc. # 59-1, at 261; Amended and Restated Promissory Note and Security Agreement, Doc. # 59-1, at 293; Taylor Affidavit, Doc. # 59-1, at 11.)  There is also evidence in the

record sufficient to raise an issue of fact as to whether Southern Farms and Givens were aware of RDG-II's insolvency.  Though Givens stated at his deposition that he was unaware of RDG-II's cash flow issues (Givens Deposition, Doc. # 59-10, at 6), Taylor testified that he informed Givens of these issues (Taylor Affidavit, Doc. # 59-1, at 7).  This conflicting testimony evidences a material dispute of fact as to this element of a § 5-9A-5(b) claim.  Accordingly, as the motions for summary judgment relate to a claim for relief under § 8-9A-5(b), they are due to be denied.

### 4.   *Defenses*

Southern Farms and Givens emphasize that the transfers giving rise to this controversy were "pursuant to the arm's length transaction" between RDG-II and Southern Farms.  (Doc. # 51, at 10; Doc. # 60, at 10.)  Lord Abbett generously suggests that these arguments could be construed as an assertion of affirmative defenses to a fraudulent transfer action.  (Doc. # 59, at 23.)   For the following reasons, however, Defendants are not entitled to summary judgment based on either of the two potential affirmative defenses.

First, Southern Farms and Givens are not entitled to summary judgment on the basis of the "good faith" defense.  That defense, which appears in the Alabama Fraudulent Transfer Act, provides that a transfer is not voidable under § 8-9A-4(a) against a transferee who took the asset in good faith and for a reasonably equivalent value.  Ala. Code § 8-9A-8(a).  Courts construing similar good faith

defenses under state and federal laws have concluded that the transferee's knowledge of the debtor's insolvency or dire financial circumstances precludes a finding of good faith. *See In re Evergreen Sec., Ltd.*, 319 B.R. 245, 255 (Bankr. M.D. Fla. 2003); *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995). Lord Abbett has submitted sufficient evidence to raise an issue of fact regarding Defendants' knowledge of RDG-II's insolvency. *See* Part IV.A.3.b, *supra*. It also has demonstrated the existence of a genuine dispute of material fact as to whether RDG-II received reasonably equivalent value in exchange for the payments. *See* Part IV.A.3.c, *supra*. Accordingly, the good faith defense fails.

Second, Defendants are not entitled to summary judgment on the basis of the "ordinary course of business" defense. This defense, also codified in the Alabama Fraudulent Transfer Act, provides that a transfer is not voidable under § 8-9A-5(b) if it was made in the ordinary course of business of the debtor and the insider. Ala. Code § 8-9A-8(f)(2). Lord Abbett's evidence suggests that several of the payments made to Southern Farms were not contemplated under the terms of their original agreements. *See generally* Part III.A.3, *supra*. The ordinary course of business defense thus provides no relief.

## B.    Piercing the Corporate Veil

Southern Farms and Givens also seek summary judgment with respect to Count One of Lord Abbett's Amended Complaint (Doc. # 65). In that Count, Lord

Abbett seeks relief "pierc[ing] the corporate veil and declar[ing] Southern Farms to be the alter ego of Givens."  (Doc. # 33, at ¶ 74).   For the following reasons, Southern Farms and Givens are not entitled to summary judgment on Count One.

### 1.    *Remedial Nature of a Claim for Piercing the Corporate Veil*

As a preliminary matter, piercing the corporate veil is merely a procedural device.  A claim seeking this form of relief, as Southern Farms and Givens point out in their respective motions,[14] is not in itself a claim for substantive relief.  Rather, a finding in support of piercing the corporate veil allows the claimant to impose liability on an individual or parent corporation for underlying causes of action brought against the defendant corporation.  *Ryals v. Lathan Co.*, 77 So. 3d 1175, 1179 (Ala. 2011) (citing 1 Fletcher, *Cyclopedia Corporations* § 41.10 (1990)).   Despite the remedial nature of the claim, it is nonetheless proper to consider its propriety at the summary judgment phase of the proceedings.  *See Johnston v. Green Mountain, Inc.*, 623 So. 2d 1116, 1121 (Ala. 1993) (affirming an order granting summary judgment on a claim for piercing the corporate veil).

### 2.    *Elements of an Alter Ego Claim*

Lord Abbett proceeds under the theory that Southern Farms is the alter ego of Givens.  To prevail on such a claim, Lord Abbett must show (1) that Givens had

---

[14] Curiously, Southern Farms argues that it is entitled to summary judgment as to Count One of Lord Abbett's Second Amended Complaint.  In fact, Southern Farms did the lion's share of the briefing with respect to Count One.  As the corporate defendant, Southern Farms faces potential liability on the underlying claim regardless of the court's resolution of the alter ego issue.  Only Givens stands to gain from an order granting summary judgment as to Count One.

complete control and domination over Southern Farms, (2) that Givens misused that control, and (3) that the misuse caused harm to Lord Abbett.  *See Messick v. Moring*, 514 So. 2d 892, 894 (Ala. 1987).

### a.   Control and Domination

With respect to the first element of this alter ego claim, it is clear that Givens is the exclusive shareholder and the sole officer of Southern Farms.  (Answers to Interrogs., Doc. # 59-5, at 4.)  Southern Farms and Givens do not dispute Givens's complete control and domination of the corporation.  They focus instead on the remaining elements, arguing that Givens did not misuse that control and that any misuse did not cause harm to Lord Abbett.

### b.   Misuse

Southern Farms and Givens argue that the undisputed evidence shows that Givens did not misuse the corporate form.  Though fraud or violation of some positive legal duty constitutes misuse, the claimant need not always prove that conduct to make out its alter ego claim.  *Messick*, 514 So. 2d at 895.   Alabama law allows a court to presume misuse of control where necessary to prevent injustice or unfairness.  *Id.*   Southern Farms and Givens rely on the affidavit of Southern Farms (Doc. # 50-1), wherein Givens served as the affiant on behalf of the corporation.   The evidence they cite in support of their motion is Givens's conclusory assertion that Southern Farms "remained free from any misuse by its

President and principal shareholder." (Doc. # 51, at 9 (citing Doc. # 50-1, at 4).) They close their arguments with the similarly conclusory assertion that "there is no evidence to contradict the affidavit testimony of Southern Farms." (Doc. # 51, at 9.) Lord Abbett responds with four examples of evidence purportedly contradicting the affidavit testimony of Southern Farms.

First, Lord Abbett offers evidence suggesting that Givens misused the corporate form by effecting payments to Southern Farms that were unfair to other creditors. Taylor stated that Givens, while knowing of RDG-II's insolvency, obtained RDG-II share pledges upon the representation that he would protect Gilley from other creditors. (Taylor Aff., Doc. # 59-1, at 7–8.) Givens, in his deposition, denies that he made such a representation. (Givens Deposition, Doc. # 59-10, at 6-7.) Even if such a representation does not rise to the level of fraudulent or illegal conduct on the part of Givens, it suggests that Givens used Southern Farms to effect transactions that were unfair to other creditors. *See Heisz v. Galt Indus., Inc.*, 93 So. 2d 918, 931 (Ala. 2012) (recognizing the propriety of piercing the corporate veil in light of evidence that transactions in question were unfair); Ala. Corp. Law § 8:4 (4th ed.) ("Alabama cases embrace the fraud principle, even extending it to include various degrees of unfairness, where such is deemed subversive of the ends of justice."). The conflicting testimony of Taylor and

Givens evidences a genuine dispute of material fact regarding Givens's misuse of the corporate form.

Second, Lord Abbett offers evidence of alleged fraudulent transfers of funds between RDG-II and Southern Farms.  As set forth in Part IV.A, *supra*, Lord Abbett has come forth with substantial evidence supporting a fraudulent transfer claim.  Measured against the conclusory affidavit testimony offered by Southern Farms and Givens regarding misuse of the corporate form, this evidence is sufficient to raise a genuine dispute of material fact regarding the misuse element of an alter ego claim.

Third, Lord Abbett contends that Givens misused the corporate form by taking advantage of share-pledge rights to effectuate transfers of funds from RDG-II to Southern Farms.  By exercising its share-pledge rights, Southern Farms took ownership of the majority of the Class B membership units.  (Givens Deposition, Doc. # 59-10, at 9.)  This ownership allowed Givens, as sole shareholder and officer of Southern Farms, to appoint his son to the RDG-II Board of Managers. (Givens Deposition, Doc. # 59-10, at 15.)  It also allowed Givens, around February of 2012, to take a position as chairman of the RDG-II's board of managers.  (*See* Givens Deposition, Doc. # 59-10, at 199.)  Givens held that position for the majority of the pendency of RDG-II's bankruptcy petition.  (Givens Deposition, Doc. # 59-10, at 199.)  In connection with those bankruptcy proceedings, RDG-II

made $200,000 in adequate protection payments to Southern Farms.  (Doc. # 59-11, at 5.)  These circumstances at least allow the inference that Givens misused his position to effectuate transfers that ultimately benefitted him as sole shareholder.

Fourth, Lord Abbett argues that Givens failed to observe the corporate form by signing agreements individually with the expectation that Southern Farms would be a party to the agreement.  According to Lord Abbett, the fact that the sole shareholder individually executes agreements on behalf of the corporation is sufficient to preclude summary judgment on the issue of piercing the corporate veil.  Lord Abbett attributes this proposition to *Ex parte AmSouth Bank of America*, 669 So. 2d 154, 157-158 (Ala. 1995).  In support of its argument, Lord Abbett offers the Principal Reduction Agreement between Ronnie Gilley Properties, LLC, RDG-II, Givens, and Southern Farms.  (Principal Reduction Agreement, Doc. # 59-1, at 262.)    Lord Abbett contends that Givens signed this agreement individually, yet expected Southern Farms to be a party.  The signature lines of the document belie this assertion, as Givens plainly signed the agreement both on behalf of Southern Farms in his capacity as its president and in his individual capacity.  (Principal Reduction Agreement, Doc. # 59-1, at 262.)  The fact that both Givens and Southern Farms were parties to this agreement does not, without more, indicate a disregard for corporate formalities.

33

Though the fourth argument regarding misuse is not particularly persuasive, the first three are well taken.  The evidence Lord Abbett has submitted is sufficient to raise a genuine dispute of material fact regarding Givens's alleged misuse of the corporate form.

### c.    Harm

Lord Abbett offers several pieces of evidence supporting the contention that it suffered harm as a result of Givens's misuse of the corporate form.  First, Taylor averred that RDG-II's transfers to Southern Farms, the potentially fraudulent nature of which is well supported by the evidence, came at the expense of other creditors.  (Taylor Aff., Doc. # 59-1, at 10.)  Because RDG-II devoted so much of its cash assets to making payments to Southern Farms, and because the business ultimately failed, RDG-II was unable to pay the assessments.  These assessment proceeds would have benefitted Lord Abbett in its position as bondholder.  (*See* Declaration of Craig Wrathell, Doc. # 59-2, at 3–4.)  Ultimately, the obligations owing to Lord Abbett remain outstanding in the amount of $29,060,000.  (Proof of Claim, Doc. # 59-7, at 2.)  Viewing the evidence in the light most favorable to Lord Abbett, the nonmoving party, it is clear there is a genuine dispute of material fact with respect to whether Givens's alleged misuse of the corporate form caused harm to Lord Abbett.

Lord Abbett presented sufficient evidence to raise genuine dispute of material fact regarding the alter ego theory of piercing the corporate veil. Specifically, it raised sufficient evidence from which the finder of fact could conclude that Givens exercised complete control over Southern Farms, that he misused that control, and that his misuse caused harm to Lord Abbett. This conclusion follows from the general principle that the question of whether the corporate form should be disregarded is a heavily fact-dependent inquiry to be determined on a case-by-case basis. *See Hill v. Fairfield Nursing & Rehab. Ctr., LLC*, 134 So. 3d 396, 411 (Ala. 2013); *Shelton v. Clements*, 834 So. 2d 775, 792 (Ala. Civ. App. 2002) ("Whether a party is an alter ego of his corporation is a question of fact to be resolved by the fact-finder.") (citing *Woods v. Commercial Contractors, Inc.*, 384 So. 2d 1076, 1072 (Ala. 1980)). As to Count One of the Second Amended Complaint, Defendants' motions for summary judgment are due to be denied.

## V.  CONCLUSION

Accordingly, it is ORDERED that Defendants' motions for summary judgment (Docs. # 50 and 52) are DENIED.

DONE this 28th day of December, 2015.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE